UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERESA S. FARNHAM
(f/k/a TERESA S. FLUENT)                                    **REPORT**
                                    Plaintiff,             **and**
                                                       **RECOMMENDATION**

            v.
                                                       **10-CV-0213 A(F)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                    Defendant.

_____

APPEARANCES:        LAW OFFICES OF WILLIAM C. BERNHARDI
                    Attorneys for Plaintiff
                    WILLIAM C. BERNHARDI, of Counsel
                    950-A Union Road
                    Suite 240
                    West Seneca, New York 14224

                    WILLIAM J. HOCHUL, JR.
                    UNITED STATES ATTORNEY
                    Attorney for Defendant
                    KEVIN D. ROBINSON
                    Assistant United States Attorney
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202, and
                    STEPHEN P. CONTE
                    Regional Chief Counsel - Region II
                    United States Social Security Administration
                    Office of the General Counsel, of Counsel
                    26 Federal Plaza
                    Room 3904
                    New York, New York 10278


## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on

June 21, 2010. The matter is presently before the court on motions for judgment on the

pleadings, filed by Defendant on November 18, 2010 (Doc. No. 10), and by Plaintiff on

March 11, 2011 (Doc. No. 13).

## BACKGROUND

Plaintiff Teresa Fluent ("Plaintiff"), seeks review of Defendant's decision denying

her Social Security Disability Insurance benefits ("SSDI"), and Supplemental Security

Income ("SSI") (together "disability benefits") under, respectively, Titles II and XVI of the

Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits,

Defendant determined Plaintiff had the severe impairments of coronary artery disease,

status post myocardial infarction, angina, diabetes mellitus and myalgia, that Plaintiff's

obesity and depressive disorder were not severe, and that Plaintiff was not disabled at

any time through the date of the application until the date of the hearing on July 22,

2008. (R. 18).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on October 19, 2005 (R. 47),

that was initially denied by Defendant on March 22, 2006. (R. 38). Pursuant to Plaintiff's

request, filed May 11, 2006 (R. 39), a hearing was held before an Administrative Law

Judge ("the ALJ") on July 22, 2008 in Buffalo, New York, at which Plaintiff, represented

by William C. Bernhardi, Esq., appeared and testified at the hearing. (R. 508). The

ALJ's decision denying the claim was rendered on October 15, 2008. (R. 16). On

December 10, 2008, Plaintiff requested review of the ALJ's decision by the Appeals

Council. (R. 10). The ALJ's decision became Defendant's final decision when the

Appeals Council denied Plaintiff's request for review on January 11, 2010. (R. 5). This

2

action followed on March 12, 2010, with Plaintiff alleging the ALJ erred by failing to consider her disabled as of November 28, 2005. (Doc. No. 1).

Following the filing of Defendant's answer on June 18, 2010 (Doc. No. 4), on November 18, 2010, Defendant filed the instant motion for judgment on the pleadings ("Defendant's motion") together with a memorandum of law (Doc. No. 11) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings ("Plaintiff's motion") on March 11, 2011, accompanied by a supporting memorandum of law (Doc. No. 14) ("Plaintiff's Memorandum").[1] On May 27, 2011, Defendant filed a reply to Plaintiff's motion on the pleadings ("Defendant's reply"), together with a supporting memorandum of law (Doc. No. 17) ("Defendant's Reply Memorandum"). On July 5, 2011, Plaintiff filed a response to Defendant's Reply (Doc. No. 20) ("Plaintiff's response"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be DENIED; Defendant's motion should be DENIED, and the matter should be remanded for further development of the record.[2]

## **FACTS**[3]

Plaintiff, was born on July 4, 1959, completed a GED, and worked as a general

---

[1]Plaintiff's Memorandum amends Plaintiff's alleged disability onset date to November 28, 2005 from December 23, 2004. Plaintiff's Memorandum at 21.

[2]42 U.S.C. § 405(g)1 provides "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *See, e.g.*, Schaal *v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)(directing ALJ, *sua sponte*, to seek additional information from Plaintiff's physician).

[3]Taken from the pleadings and the administrative record.

3

laborer from March 22, 1979 until December 24, 2004. (R. 60). At the administrative hearing on July 22, 2008, Plaintiff, 49 years old, was married, and lived with her husband. (R. 510).

On October 6, 1996, nine years prior to Plaintiff's alleged disability onset date, Plaintiff underwent coronary bypass surgery to repair Plaintiff's left anterior descending artery ("LAD"). (R. 99-112).

On January 28, 2004, Plaintiff visited the neuromuscular clinic at Strong Memorial Hospital in Rochester, New York, for pain and soreness in Plaintiff's arms and legs, where Michael Yurcheshen, M.D. ("Dr. Yurcheshen") opined a neurological examination of Plaintiff's forearms showed mild decrease to pinprick in the first 2 digits of Plaintiff's hands bilaterally, mild tenderness on deep palpation of Plaintiff's forearms, and mild Tinel's (irritated nerves) at Plaintiff's left wrist (R. 260), and was consistent with a diagnosis of mild carpal tunnel syndrome. On February 2, 2004, a nerve conduction study of Plaintiff's ulnar and median nerves by Emma Ciafaloni, M.D. ("Dr. Ciafaloni"), confirmed Dr. Yurcheshen's carpal tunnel syndrome diagnosis. (R. 262). On October 19, 2005, Plaintiff filed her disability benefits application. (R. 56-66).

On November 28, 2005, Plaintiff presented to Brooks Memorial Hospital in Olean, New York with complaints of chest pain. (R. 299). After receiving stabilizing treatment, Plaintiff was transferred to Hamot Medical Center in Erie, Pennsylvania where an electrocardiogram ("EKG") test of Plaintiff's heart showed a possible inferior mycardial infarction (heart attack), with non-specific electrical wave abnormality.[4] (R. 302).

---

[4]The electrical waves or signals measured on an EKG test are used to diagnose abnormal heart beating referred to as "arrhythmias" or "dysrrythmias."

Gurjaipal Kang, M.D. ("Dr. Kang") performed a cardiac catheterization procedure (insertion of a catheter into the heart muscle used to diagnose and treat heart conditions) on Plaintiff's left heart that showed a 30% lesion of Plaintiff's left main coronary artery ("LMCA"), two occluded saphanous vein grafts ("SVG"), a 90% lesion of Plaintiff's left circumflex coronary artery ("LCX") with diffuse disease, a 60% lesion of Plaintiff's right coronary artery ("RCA") at the crux, a 40% ostial lesion of Plaintiff's RCA, and a second proximal long 40% lesion of Plaintiff's RCA. (R. 297). Dr. Kang opined Plaintiff's RCA "did not appear severe enough to need percutaneous intervention"[5] (R. 297), and that the narrowing of Plaintiff's LCA was not appropriate for percutaneous intervention because Plaintiff's circumflex artery branches were too narrow and thin. *Id*. Upon discharge, David M. Strasser, M.D. ("Dr. Strasser") diagnosed Plaintiff with non-ST elevated myocardial infarction, native coronary heart disease, coronary artery disease bypass grafts, dyslipidemia (high cholesterol), hypertension, weight excess, Type 2 diabetes mellitus, and medication noncompliance secondary to financial constraints. (R. 273).

On December 27, 2005, Disability Analyst K. Badger, ("D.A. Badger"), with the Social Security Administration, transmitted an electronic request for medical advice ("Form DSS-4286") to Helen M. Findlay, M.D. ("Dr. Findlay"), a physician with the New York State Office of Temporary and Disability Assistance, for determination of whether Plaintiff was medically able to withstand exercise tolerance testing ("ETT"). (R. 328). Dr. Findlay advised D.A. Badger that Plaintiff's residual functional capacity ("RFC") was

---

[5] Percutaneous intervention is coronary angioplasty, a surgical procedure used to repair narrowed coronary arteries.

"likely to be light," that Plaintiff was not taking the diabetes medication prescribed to her by cardiologist Henry Storch, M.D. ("Dr. Storch"), that Plaintiff's allegations regarding her muscle pain and weakness had no supporting objective medical evidence, and that Plaintiff's ETT should be deferred for three months. (R. 329,441). A request for medical advice to Dr. Findlay from Disability Analyst T. Kriner ("D.A. Kriner") on February 9, 2006, requested a determination of whether the RFC of "light" was appropriate for Plaintiff, given Plaintiff's aortic stenosis (coronary artery narrowing), lack of cardiac intervention, and ETT results. (R. 329). On February 15, 2006, Dr. Findlay advised D.A. Kriner that a "light" RFC classification was not appropriate for Plaintiff, and that Plaintiff's RFC assessment should be deferred for three months because Plaintiff's "11/5/05 discharge summary for NON-ST elevated MI [myocardial infarction] (ACS) [wa]s a CARDIAC EVENT and a cardiac cath showed occlusion of [Plaintiff's] SVG's close to the ostium of the LCX vessel confirm progression of [Plaintiff's] CAD (coronary artery disease) ("CAD"). (R. 329)(bracketed material added).[6]

On March 4, 2006, at the request of the Social Security Administration, Harbinder Toor, M.D. ("Dr. Toor"), completed a consultative internal medical examination on Plaintiff that showed Plaintiff able to walk on her heels and toes without difficulty, rise from a chair without difficulty, normal gait and stance, and leg weakness. (R. 331). Dr. Toor noted Plaintiff's activities of daily living included cooking three times a week, no cleaning, or laundry due to chest pain, no child care, no sports, no socialization, shopping once each week (R. 331), and opined Plaintiff should avoid heavy exertion

---

[6]Unless otherwise indicated, all bracketed material is added.

because of Plaintiff's history of chest pain, heart attacks, and heart disease, and assessed Plaintiff with mild limitation to walking long distances, standing for a long time, and pushing or pulling. (R. 333). On March 15, 2006, Janis L. Dale, M.D. ("Dr. Dale"), a physician with the New York State Office of Temporary Disability Assistance, reviewed Dr. Toor's March 4, 2006 examination results, and opined Plaintiff was able to lift 20 pounds occasionally, 10 pounds frequently, walk 6 hours in an 8 hour workday, and assessed Plaintiff with an RFC of "light." (R. 334). On March 22, 2006, D.A. Badger completed a physical residual functional capacity assessment on Plaintiff, and opined Plaintiff demonstrated the ability to maintain routine daily activities, occasionally lift 20 pounds, lift ten pounds frequently, stand and/or walk about six hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and had unlimited capacity to push or pull hand and foot controls. (R. 336).

On March 29, 2006, Kavitha Dheenadayalu, M.D. ("Dr. Dheenadayalu"), Plaintiff's internal medicine physician, completed a physical examination of Plaintiff, diagnosed Plaintiff with coronary artery disease, dyslipidemia, diabetes mellitus, and myalgia, and referred Plaintiff to Dr. Storch. (R. 441). On April 12, 2006, Plaintiff presented to Olean General Hospital emergency room with complaints of chest pain on exertion (R. 433), where, upon examination, Dr. Dheenadayalu advised Plaintiff to avoid heavy lifting or severe exertion prior to completing a stress test, and prescribed Nitrol paste (chest pain), and glucovance (diabetes medication). (R. 434). On April 25, 2006, Dr. Storch completed a medical examination of Plaintiff, noted Plaintiff experienced chest pain while walking that improved with rest, diagnosed Plaintiff with possible angina pectoris, severe coronary atherosclerosis with preserved left ventricular function, history of mild

7

aortic stenosis, and suggested Plaintiff undergo a Cardiolite stress test to determine if

the muscular tissue of Plaintiff's heart was jeopardized. (R. 431). Dr. Storch noted

Plaintiff's medications included enalapril (blood pressure), lipitor (cholesterol), glyburide

(diabetes), lexapro (depression), plavix (blood clots), imdur (heart), atenolol (blood

pressure), zetia (cholesterol), actos (diabetes), nitroglycerin (heart) and aspirin. *Id*.

On May 2, 2006, Bluett E. Jones, D.D.S., M.D. ("Dr. Jones"), performed a nuclear

stress test on Plaintiff. (R. 428-29). The test, however, had to be discontinued after 6

minutes and 19 seconds, only 19 seconds into the third stage of the test, performed

according to standard "Bruce protocol,"[7]  that showed Plaintiff able to tolerate exercise at

a capacity of 53% of Plaintiff's age-predicted expected maximal heart rate at 7 multiples

of resting oxygen consumption ("METS").[8] (R. 428). Dr. Jones opined Plaintiff exhibited

poor exercise tolerance, and concluded Plaintiff's ETT test was "non-diagnostic"

because Plaintiff was able to achieve only 56%[9] of her age predicted maximal heart rate

before ending the test because of Plaintiff's shortness of breath and tired legs. *Id*.

On June 28, 2006, Plaintiff returned to Dr. Dheenadayalu's office for a follow up

appointment, and reported upper and lower extremity muscle aches and also reported

taking NitroQuick (nitroglycerin) tablets when ambulating. (R. 344). Upon administration

---

[7]Bruce protocol is a maximal exercise test where a patient works to complete exhaustion as treadmill speed and incline is increased every three minutes in 9 stages.

[8]A heart's functional level is expressed as a metabolic equivalent. One metabolic equivalent is equal to the amount of energy expended by a person while standing at rest. See 7-30, Attorney's Textbook of Medicine, Heart Disease, § 30.42[6].

[9]Threshold results of ETT tests must equal 75 % of a person's age-related heart rate.

of the Hamilton Rating Scale for Depression,[10] Dr. Dheenadayalu diagnosed Plaintiff

with moderate depression with somatization, and prescribed Effexor (anti-depressant).

*Id*. On August 29, 2006, Dr. Dheenadayalu noted Plaintiff continued to report aches in

her upper and lower extremities, feelings of helplessness, crying, anger, depression, and

tiredness with only four hours of sleep nightly. (R. 344). Dr. Dheenadayalu diagnosed

Plaintiff with history of coronary artery disease, diabetes mellitus, moderate depression

with somatization, and noted Plaintiff's body mass index ("BMI") was 32.[11] *Id*. On

September 29, 2006, Dr. Dheenadayalu diagnosed Plaintiff with a sleep disorder

(sleeping three to four hours each night), muscle aches, and prescribed Lunesta (sleep

aid), and Trazodone (anti-depressant). (R. 343). On December 13, 2006, Dr.

Dheenadayalu noted Plaintiff exhibited improved symptoms of depression, and had fluid

on her right ankle. (R. 342). On December 27, 2006, Dr. Dheenadayalu noted Plaintiff

reported no depression, had minimal ankle swelling, was tired, and sleeping up to 18

hours daily. (R. 342). Plaintiff left an appointment with Dr. Dheenadayalu on March 14,

2007, reporting she did not have medical insurance, and was not able to self-pay for the

visit which was estimated at $45 to $60. (R. 341).

On August 2, 2007, Plaintiff sought treatment from Dr. Storch for forearm muscle

aches, and right thigh pain. (R. 352). On August 13, 2007, Dr. Storch examined Plaintiff

---

[10] The Hamilton Rating Scale for Depression ("HDRS") is a multiple choice questionnaire used to rate the severity of an individual's depression.

[11] BMI is the established medical criteria for obesity, which is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). *See* Social Security Ruling ("SSR") 02-1p, 2002 WL 34686281, at *2 (S.S.A. Sept. 12, 2002). A person with a BMI of 25-29.9 is considered overweight. A person with a BMI above 30.0 is considered obese. See, http://www.cdc.gov/hea;thyweight/assessingbmi/adult_bmi/index/index.htm.html#Interpreted.

for chest pain, prescribed a nighttime nitroglycerin patch for Plaintiff, and scheduled Plaintiff for an adenosine stress test[12] ("AST"). (R. 351).

On August 28, 2007, Cyril Guanawardane, M.D. ("Dr. Guanawardane") performed an echocardiogram ("EKG") on Plaintiff, opining the EKG was negative for myocardial ischemia (imbalance between myocardial blood supply and oxygen demand) by EKG criteria. (R. 399). Also on August 28, 2007, Dr. Jones completed an AST test on Plaintiff that showed "decreased uptake of the radiopharmaceutical (adenosine) . . . in the anterior and lateral walls of [Plaintiff's] myocardium . . . [a] color change in the anterior wall of 10% . . . [that did] not represent a significant stenosis . . . [and] color change in the lateral wall [of] 40% [that] may represent a significant stenosis." (R. 398-402).

On September 4, 2007, Dr. Storch opined Plaintiff's AST test results showed "possible lateral ischemia (40% color change), and recommended Plaintiff undergo coronary arteriography to detect any narrowing or blockage in Plaintiff's coronary arteries. (R. 348). On September 18, 2007, Physician Assistant M. Silliker ("P.A. Silliker"), with Dr. Storch's office, noted Plaintiff reported occasional chest pain was relieved with nitroglycerin. (R. 345). P.A. Silliker advised Plaintiff that insulin therapy would be necessary to control Plaintiff's diabetes if Plaintiff failed to follow Dr. Storch's diet recommendations. (R. 346).[13]

At the administrative hearing on July 22, 2008, Plaintiff testified she experienced

---

[12] Adenosine is a drug used to cause a person's body to respond as if it were exercising.

[13] Over the preceding 15 months, blood sugar tests showed Plaintiff with elevated blood sugar levels of 155 mg/dl on July 12, 2006 (R. 381), 176 mg/dl on March 2, 2007 (R. 413), 191 mg/dl on May 21, 2007 (R. 375), 164 mg/dl on July 27, 2007 (R. 367), and 213 mg/dl on September 18, 2007. (R. 365). Blood glucose levels are considered normal when they measure less than 150 mg/dl.

joint pain (R. 512), angina-like symptoms two to three times each day both with and

without activity (R. 514), shortness of breath (R. 515), finger and hand numbness (R.

515), arm pain (R. 516), leg pain (R. 517), and swelling of her legs and feet. *Id*. No one

else, such as a vocational expert, was called to testify at the hearing.

## DISCUSSION

**1.      Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than
> 12 months. . . .  An individual shall be determined to be under
> a disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past

relevant work, the burden shifts to the Commissioner to prove there is alternative

employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d

225, 231 (2d Cir. 1980).

**A.      Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S.
389, 401 (1971). Substantial evidence requires enough evidence that a reasonable
person would "accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d
183, 188 (2d Cir. 2004) citing *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co.
v. NLRB*, 305 U.S. 197, 229 (1938)).

While evaluating a claim, the Commissioner must consider "objective medical
facts, diagnoses or medical opinions based on these facts, subjective evidence of pain
or disability (testified to by the claimant and others), and . . . educational background,
age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983)
(quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating
physician is supported by medically acceptable techniques and results from frequent
examinations, and the opinion supports the administrative record, the treating
physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. §
416.927(d)*; Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is
supported by substantial evidence. *Dumas*, 712 F.2d at 1550; 42 U.S.C. §§ 405(g) and
1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[14] if
supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685
F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must

---

[14] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the
function of the Secretary of Health and Human Services in Social Security cases was transferred to the
Commissioner of Social Security, effective March 31, 1995.

follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520

and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). The first step is to determine whether the

applicant is engaged in substantial gainful activity during the period of which benefits are

claimed.  20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such

activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.*  The

next step is to determine whether the applicant has a severe impairment which

significantly limits the physical or mental ability to do basic work activities as defined in

the applicable regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent an

impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an

impairment and the impairment, or an equivalent, is listed in Appendix 1 of the

regulations and meets the duration requirement, the individual is deemed disabled,

regardless of the applicant's age, education or work experience, 20 C.F.R. §§

404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant

with such an impairment is unable to perform substantial gainful activity.[15]  42 U.S.C. §§

423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also*

*Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646

F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in

Appendix 1, the Commissioner must then consider the applicant's "residual functional

capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). If

---

[15] The applicant must also meet the duration requirement which mandates that the impairment must last or be expected to last for at least a 12-month period.  20 C.F.R. §§  404.1509 and 416.909.

the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the decision. *Richardson*, 402 U.S. at 410 (1971).

**B.**     **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it includes less responsibility or pay than work previously performed. 20 C.F.R. § 404.1572(a). Earnings may also determine engagement in substantial gainful activity. 20 C.F.R. § 404.1574. In the instant case, the ALJ concluded Plaintiff did not engage in

substantial activity since December 23, 2004 (R. 14), and Plaintiff does not contest this finding.

## C.   Severe Physical or Mental Impairment

The second step of the analysis requires a determination whether Plaintiff has a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509 ("§ 404.1509), and significantly limits the Plaintiff's ability to do "basic work activities."  The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

In the instant case, the ALJ found that Plaintiff's coronary artery disease, status post myocardial infarctions, angina, diabetes mellitus, and myalgia were severe, but that Plaintiff's obesity and depression were not severe. (R.18). Plaintiff does not contest this determination.

## D.   Listing of Impairments, Appendix 1

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments"). If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough

to prevent the claimant from performing any gainful activity and the claimant is considered disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled").

The relevant listing of impairments in this case includes 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 4.04 (ischemic heart disease) ("§ 4.04"), 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 9.08 (diabetes mellitus) ("§ 9.08"), and 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 12.04 (affective disorders) ("§ 12.04"). Although Plaintiff does not contest the ALJ's determination that Plaintiff's impairments of coronary artery disease, status post myocardial infarctions, angina, diabetes mellitus, and myalgias were severe, Plaintiff does contest the ALJ's finding Plaintiff's ischemic heart disease failed to meet the listing of impairment for ischemic heart disease under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04, *et. seq.*, effective April 13, 2006. Plaintiff's Memorandum at 10. Inasmuch as the ALJ's determination offers little or no detail to address whether Plaintiff's various severe impairments meet or equal any particular listed impairment, the court will discuss each severe impairment in turn.

**1. Ischemic Heart Disease**

Relevant to the instant case, disability under § 4.04 (ischemic heart disease) is characterized by symptoms due to myocardial ischemia as described in §§ 4.00E3 (typical angina pectoris), 4.00E4 (atypical angina), 4.00E5 (anginal equivalent), 4.00E6 (variant angina), or 4.00E7 (silent ischemia). Here, the medical record establishes Plaintiff has all of these symptoms.

First, under § 4.00E3, symptoms of myocardial ischemia are defined by

characteristics of angina pectoris that include discomfort of myocardial origin precipitated by effort or emotion promptly relieved by rest, sublingual nitroglycerin, or other rapidly acting nitrates. On April 25, 2006, Dr. Storch noted Plaintiff exhibited precordial chest discomfort while walking (R. 430), and an examination on September 18, 2007, by P.A. Silliker showed Plaintiff with occasional tightness in her chest relieved with nitroglycerin (R. 345), thus supporting Plaintiff's ischemic heart disease was characterized by myocardial ischemia as defined under § 4.00E3.

Plaintiff's ischemic heart disease is also characterized by symptoms of atypical angina, described under § 4.00E4, including muscle aches generalized in Plaintiff's upper and lower extremities (R. 344), and muscle aches in Plaintiff's thighs, ankles, and shoulder (R. 441). Plaintiff's ischemic heart disease is also characterized by such symptoms as shortness of breath on exertion without chest pain or discomfort (R. 428, 436), establishing anginal equivalent under § 4.00E5, episodes of anginal episodes at rest, especially at night (R. 433), establishing variant angina under § 4.00E6, and silent ischemia, including myocardial ischemia without pain (including pain sensitivity altered by diabetes mellitus), establishing silent ischemia under § 4.00E7. The record thus establishes Plaintiff's heart impairment meets the criteria of IHD under § 4.04 as Plaintiff's heart impairment was characterized by symptoms of myocardial ischemia as defined under §§4.00E3, 4.00E4, 4.00E5, and 4.00E6, and 4.00E7.

In addition to the threshold requirements under § 4.00E3 - §4.00E7, in order to be found disabled under § 4.04, a claimant must also satisfy the criteria of § 4.04A, § 4.04B, or § 4.04C. In the instant case, the ALJ made no determination of whether Plaintiff's ischemic heart disease meets or equals the criteria under §§ 4.04A, 4.04B, or

4.04C of the Listing of Impairments, presumably because the ALJ concluded Plaintiff

does not meet the prerequisite criteria. Although the undersigned finds the medical

record establishes Plaintiff does meet the prerequisite criteria for ischemic heart disease

under § 4.04, nevertheless, substantial evidence supports the ALJ's determination that

Plaintiff does not meet the criteria under § 4.04A, or § 4.04B, but may meet the criteria

under § 4.04C.

**§ 4.04A**

The criteria for disability under § 4.04A includes:

A. Sign-or symptom-limited exercise tolerance test demonstrating at least one of
[four] manifestations at a workload equivalent to 5 METs or less.

Inasmuch as Plaintiff's ETT test results on May 2, 2006 showed "poor exercise

tolerance . . . no chest pain or ST changes of ischemia" (R. 428), Plaintiff was able to

reach a maximum heart rate of 96 beats per minute (56% of age predicted maximal

heart rate) at 7 METS. As such, the record is without any evidence of documented

ischemia at an exercise level equivalent to 5 METs, the initial requirement under §

4.04A. It is thus unnecessary to consider whether Plaintiff meets any of the four

separately enumerated criteria, i.e., § 4.04A (1) -(4). Plaintiff is therefore not disabled

under § 4.04A.

**§ 4.04B**

In order to be found disabled under § 4.04B, a disability claimant must

demonstrate three separate ischemic episodes, each requiring revascularization, or not

amenable to revascularization (see § 4.00E9f), within a consecutive 12-month period

18

(see § 4.00A3e).[16]

> In 4.04B, each of the three ischemic episodes must require revascularization or be not amenable to treatment. *Revascularization* means angioplasty (with or without stent placement) or bypass surgery. However, reocclusion that occurs after a revascularization procedure but during the same hospitalization will not be counted as another ischemic episode. Not amenable means that the revascularization procedure could not be done because of another medical impairment or because the vessel was not suitable for revascularization.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00E9f ("§ 4.00E9f").

 In the instant case, the ALJ determined Plaintiff's ischemic heart disease did not meet or equal the listing under § 4.04. Although Plaintiff's left heart catheterization and angiography test results on November 28, 2005, showed a 90% lesion of Plaintiff's LCX "not appropriate for percutaneous intervention" (R. 277), and a cardiac catheterization on July 18, 2006 (R. 488-89), revealed a 90% lesion of Plaintiff's circumflex artery that Dr. Conley opined included a small branch not appropriate for percutaneous intervention, Plaintiff's third cardiac catheterization procedure was completed on September 28, 2007 (R. 445-58), and therefore, does not fall within the twelve month time period required under § 4.04B. Thus, Plaintiff is not disabled under § 4.04B.

**§ 4.04C**

§ 4.04C is used only when a claimant exhibits (1) symptoms due to myocardial ischemia as described in §§ 4.00E3-4.00E7, (2) is on a regime of prescribed treatment, (3) is at risk for exercise testing, and, (4) the record does not contain a "timely" exercise

---

[16] Plaintiff contends the ALJ did not properly rely upon 20 C.F.R. Pt. 404, Subpt. P, App 1, § 4.04B (modified on April 13, 2006, 71 Fed. Reg, 2318, 2319). Plaintiff's Memorandum at 14. Inasmuch as the ALJ's October 15, 2008 determination was based on misapplication of the proper revision of § 4.04B, this error does not otherwise alter the outcome for the purposes of this court's Report and Recommendation. The court therefore uses the final rules in accordance with standards defined under 71 Fed. Reg. 2312-01, 2006 WL 63805, at *2313 (S.S.A. January 13, 2006).

test. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00E9g ("§ 4.00E9g"). Here, Plaintiff's

ischemic heart disease was treated with a regime of prescribed treatment, including

Plavix (blood clots), Enalapril (blood pressure), atenolol (blood pressure), Crestor

(cholesterol), sublingual NitroQuick (chest pain), and Nitroglycerin (chest pain) (R. 460),

as required under § 4.00E9g. As such, § 4.04C is the appropriate section under which

Plaintiff should be evaluated because Plaintiff exhibited symptoms of myocardial

ischemia, was on a regime of prescribed treatment, and was at risk for exercise testing.

Moreover, the record does not contain a "timely" exercise test, *i.e.*, performed within the

preceding twelve months. § 4.04C9.

> To be disabled under § 4.04C, a claimant must provide substantial evidence of
>
> Coronary artery disease, demonstrated by angiography (obtained independent of
> Social Security disability evaluation) or other appropriate medically acceptable
> imaging, and in the absence of a timely exercise tolerance test or a timely normal
> drug-induced stress test, an MC [medical consultant], preferably one experienced
> in the care of patients with cardiovascular disease, has concluded that
> performance of exercise tolerance testing would present a significant risk to the
> individual

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04C ("§ 4.04C").

Although not considered by the ALJ, exercise tests are considered "timely" under

§ 4.04C9a for twelve months after they are performed. Here, Dr. Storch was required to

prematurely discontinued a stress test on May 2, 2006, secondary to Plaintiff's tired legs

and shortness of breath (R. 428). Plaintiff's May 2, 2006 Bruce protocol[17] stress test (R.

428), and August 28, 2007 Adenosine[18] stress test (R. 399), were "timely" until May 2,

---

[17] A Bruce protocol stress test evaluates an individual's cardiac fitness using an exercise treadmill.

[18] Adenosine stress tests evaluates an individual's heart using camera images and the drug Adenosine (as a stressor).

2007, and August 28, 2008 respectively. The ALJ's decision, however, became final on

October 15, 2008, more than twelve months after Plaintiff's August 28, 2007 stress test.

Accordingly, under § 4.04C9, both Plaintiff's May 2, 2006 and August 28, 2007 stress

tests are "untimely" under the criteria of § 4.04C.

In addition to the requirements set forth above, to be found disabled under §

4.04C, a claimant must also provide substantial evidence of both:

1. Angiographic evidence showing
a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
b. 70 percent or more narrowing of another nonbypassed coronary artery; or
c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

e. 70 percent or more narrowing of a bypass graft vessel; <u>and</u>
2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04C ("§ 4.04C")(underlining added). For

purposes of this discussion, Plaintiff's bypass surgery on October 6, 1996, included

surgical bypass of Plaintiff's LAD. (R. 256). Here, the record establishes Plaintiff's

ischemic heart disease meets the criteria under § 4.04C1a and b, and may meet the

criteria under § 4.04C1c, and that the ALJ erred in determining whether the criteria of §

4.04C2 were satisfied.

## § 4.04C1a

In order to meet the criteria under § 4.04C1, a claimant's angiography test results

must reveal "50 percent or more narrowing of a nonbypassed left main coronary artery."

Here, a cardiac catheterization performed by Dr. Kang on November 29, 2005, revealed

Plaintiff's "native circumflex was 90% with diffuse disease." (R. 273). Significantly, the

circumflex artery is a branch of the left main coronary artery.[19] Nothing in the record indicates Plaintiff ever underwent a bypass procedure on her left main coronary artery,[20] thus possibly establishing Plaintiff's ischemic heart disease was characterized by 50% or more narrowing of Plaintiff's nonbypassed artery as required under § 4.04C1a.

## § 4.04C1b

Plaintiff also meets the criteria for disability under § 4.04C1b, which requires "70 percent or more narrowing of another nonbypassed coronary artery." In particular, Plaintiff's July 18, 2006 cardiac catheterization test results showed "multiple critical narrowings with proximal 50%, mid 90%, and distal 90% narrowing, along with 90% narrowing at the bifurcation into the posterior descending artery" of Plaintiff's RCA. (R. 488). The absence of any evidence in the record that Plaintiff underwent any bypass procedure on her RCA, along with the other medical evidence in the record, unchallenged by the Defendant, that Plaintiff's RCA was at least 70% narrowed, establishes Plaintiff's ischemic heart disease was characterized by 70 percent or more narrowing of another nonbypassed coronary artery as required under § 4.04C1b.

## § 4.04C1c

Disability under § 4.04C1c, requires a claimant's angiography test results show "50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery." Here, Plaintiff's angiography test results revealed narrowing of a "long" segment of Plaintiff's non bypassed coronary arteries. In particular,

---

[19]*See*, Attorney's Dictionary of Medicine, § C-29003, 1C, 1-C.

[20] As stated, Facts at 4, on October 6, 1996, Plaintiff underwent coronary bypass surgery on her LAD, which branches off from the left main coronary artery.

angiography completed by Dr. Kang on November 28, 2005, revealed a 60% lesion of Plaintiff's RCA at the crux, a 40% ostial lesion of Plaintiff's RCA, and "another proximal long 40% lesion." (R. 297)(underlining added). An angiography procedure by Dr. Conley on July 18, 2006, showed Plaintiff's "left circumflex artery showed patency of medium sized first marginal artery followed by distal lengthy 90% narrowing in the vertical segment before a small terminal branch," and  "multiple critical narrowings" of Plaintiff's RAD. (R. 487)(underlining added). The record's lack of evidence quantifying the exact length of the narrowing of Plaintiff's coronary arteries (and thus whether Plaintiff's narrowed segment was greater than 1 cm in length), is a factual gap in the record which required the ALJ to obtain further evidence before making a determination as to whether Plaintiff meets the criteria for disability under § 4.04C1. However, because the record already establishes Plaintiff's coronary artery disease meets the criteria under § 4.04C1a and b, it is not necessary to remand the matter to the ALJ for further development of the record to close such evidentiary gap with regard to § 4.04C1c.

## § 4.04C2

In addition to meeting the criteria under § 4.04C1, in order to be found disabled under § 4.04, a claimant's ischemic heart disease must also "[r]esult in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04C2 (§ 4.04C2"). Activities of daily living include adaptive activities like cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, and using a post office. C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A1 ("§ 12.00A1"). The quality of a claimant's activities of daily

living are assessed by their independence, appropriateness, effectiveness, and sustainability. *Id*.

In the instant case, the ALJ determined "nothing in the record [ ] support[ed] the severity of the symptoms testified to by the Plaintiff" (R. 22), including the Plaintiff's testimony she is able to walk only 20 feet before resting, sit or stand for one half hour at a time, unable to lift more than two pounds, push, pull, squat or climb, experiences arm and leg pain, tires easily, has shortness of breath, chest pain, numbness in her fingers and hands, and is not able to work full-time. (R. 512-17). Significantly, the ALJ assigns "significant weight" to the opinions of consultative examining physicians Drs. Dale, Findlay, and Toor (R. 22), affords "little" weight to the opinions of Dr. Castro and Dr. Stevens (R. 22-23), and fails to consider the opinions of Plaintiff's treating cardiologist Dr. Storch, and treating physician Dr. Dheenadayalu.

The Act requires ALJs grant significant weight to treating physician opinions supported by medical evidence in the record, and requires the ALJ give a treating physician's opinion "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). In particular, the Act provides

> [g]enerally, we give more weight to opinions from your
> treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings alone
> or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we find
> that a treating source's opinion on the issue(s) of the nature

> and severity of your impairment(s) is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling
> weight.

20 C.F.R. § 404.1527(d)(2); *Clark v. Commissioner of Soc. Sec.*, 114 F.3d. 115, 118 (2d Cir. 1998).

The regulations define "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] ... with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1502. If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. *Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

Here, the frequency and nature of Dr. Storch's multiple examinations establish Dr. Storch is Plaintiff's treating cardiologist. Specifically, Dr. Storch started treating Plaintiff in September 2003 (R. 500), and continued treating Plaintiff on a regular basis until September 2007. In particular, Dr. Storch examined Plaintiff on March 29, 2006 (R. 441), April 25, 2006 (R. 431), May 12, 2006 (R. 415), August 2, 2007 (R. 352), August 13, 2007 (R. 350), September 4, 2007 (R. 348), and September 7, 2007 (R. 347), and Plaintiff was examined by P.A. Silliker, a physician assistant in Dr. Storch's office, on May 11, 2007 (R. 356), June 18, 2007 (R. 354), September 18, 2007 (R. 345), and September 28, 2007 (R. 345). Furthermore, more weight is given to the medical opinion if a treating source who is specialized in the subject medical field. 20 C.F.R. §§

404.1527(d)(2)(5); 416.927(d)(2)(5); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.
2004). Thus, the opinion of Dr. Storch, a heart specialist, that Plaintiff's leg pain occurs
more frequently with activity (R. 460), that Plaintiff's pain is relieved by rest, that Plaintiff
should pace herself better with rest and activities (R. 467), and that Plaintiff's change in
exercise tolerance, increased shortness of breath, and chest pressure relieved by
nitroglycerin, warrant repeat cardiac catheterization (R. 415), required consideration by
the ALJ.

Although treating physician opinions are not determinative, and are given
controlling weight only when not inconsistent with other controlling evidence, 20 C.F.R.
§404.1527(d); *Halloran*, 362 F.3d at 31 (citing *Vieno v. Barnhart*, 312 F.3d 578, 588 (2d
Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993), in this case, Dr. Storch's
opinions are consistent with substantial evidence including Plaintiff's May 2, 2006 Bruce
protocol stress test (R. 428), August 28, 2007 Adenosine stress test (R. 398), and
September 28, 2007 cardiac catheterization procedure. (R. 445, 487). The ALJ thus
erred by failing to take account of specific findings made by Dr. Storch consistent with
Plaintiff's claim, and, without discussion, in disregarding without explanation Dr. Storch's
findings. (R. 22).

Further, the ALJ's determination that the opinions of Dr. Castro and Dr. Stevens
should be afforded "little weight . . . because they are based upon [Plaintiff's] subjective
complaints [and] not clinical objective evidence" (R. 22), is also misplaced. Dr. Stevens's
opinion that Plaintiff had tenderness on squeezing her distal arm and proximal muscles
of her shoulder girdle [and] trapezii is based on Dr. Stevens's September 3, 2004
physical examination of Plaintiff (R. 500), and, substantially, led Dr. Stevens to suggest

further tests were necessary to "[r]ule out [*sic*] polymyositis or polymyalgia rheumatica." (R. 501). As such, the ALJ violated the Act's requirement that requires an ALJ always give "good  reasons in [the] notice of determination or decision for the weight given a claimant's treating source's opinion." § 404.1527(d)(2).

Moreover, the consultative opinions of Dr. Findlay (February 15, 2006 (R. 329)), and Dr. Toor (March 4, 2006 (R. 330)), were proffered before Plaintiff's May 2, 2006 stress test (R. 428), July 18, 2006 cardiac catheterization (R. 487), August 27, 2007 echocardiogram (R. 403), August 28, 2007 AST stress test (R. 399), and September 28, 2007 cardiac catheterization. (R. 445). Thus, the opinions of Drs. Findlay and Toor cannot be deemed complete without a review of Plaintiff's more recent and relevant cardiac test results, and the ALJ's reliance on the opinions was erroneous. *Tarsia v. Astrue*, 2011 WL 1313699, at *2, (2d Cir. Apr. 7, 2011)(medical opinion not complete without review and discussion of evaluative test results on file).

Upon remand, the ALJ should be required to reconsider the opinions of Plaintiff's treating cardiologist Dr. Storch, and Plaintiff's treating family physician Dr. Dheenadayalu with regard to whether such opinions are consistent with other substantial evidence in the record in order to establish whether the opinions should be granted controlling weight. The ALJ should also be required to provide test results from Plaintiff's May 2, 2006, July 18, 2006, August 27, 2007, August 28, 2007, and September 28, 2007 examinations and diagnostic testing to Drs. Findlay and Toor in order to ensure the opinions of Dr. Findlay and Dr. Toor are based on substantial evidence consistent with the requirements under § 404.1527(d)(2).

**Obesity**

In addition to determining whether Plaintiff's ischemic heart disease meets or equals the criteria under § 4.04, the Act requires the ALJ "consider any additional and cumulative effects of obesity when [determining] whether [a plaintiff] ha[s] a severe cardiovascular impairment or a listing level impairment (or a combination of impairments that medically equals the severity of a listed impairment)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00I1 ("§ 4.00I1"). Where the record contains evidence of limiting effects from a claimant's obesity, the ALJ must consider the impact of Plaintiff's obesity together with the Plaintiff's related impairments. *Sotack v. Astrue*, 2009 WL 3734869, at *5 (W.D.N.Y. Nov. 4, 2009)(ALJ is required to consider the impact of Plaintiff's obesity together with Plaintiff's related impairments when record contains evidence of Plaintiff's obesity and limiting effects). Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities. *Rockwood v. Astrue*, 614 F.Supp.2d 252, 276 (N.D.N.Y. 2009) (citing *Day v. Commissioner of Social Sec.*, 2008 WL 2331401, at * 5 (N.D.N.Y. June 3, 3008)(no obligation for ALJ to discuss obesity where examining physicians failed to discuss Plaintiff's obesity as a contributing factor to Plaintiff's impairments)).

In the instant case, the record establishes that Plaintiff is obese (R. 141, 143, 353, 346, 356, 430), but is otherwise devoid of any evidence that Plaintiff's treating or examining sources considered Plaintiff's obesity a significant factor relative to Plaintiff's ability to perform basic work activities. As such, the ALJ had no duty to discuss Plaintiff's

obesity under § 4.00I1 of the Act.

## § 12.04 Affective Disorders

Disability under § 12.04 (affective disorders), is characterized by "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04A1. The steps required to properly evaluate mental impairments are outlined under 20 C.F.R. § 404.1520(a), and require ALJ's rate four broad functional areas when assessing functional limitations related to mental impairments. 20 C.F.R. § 404.1520(c)(3). The degree of limitation in the first three areas (activities of daily living, social functioning, and concentration, persistence, or pace) use a five-point scale: none, mild, moderate, marked, and extreme.

In the instant case, the ALJ opined Plaintiff "is severely depressed but refuses to take any antidepressants," that Plaintiff's mental limitation "does not cause more than minimal limitation in [Plaintiff's] ability to perform her ability to perform basic mental work activities and is therefore nonsevere," and that Plaintiff's depression was not as severe as Plaintiff alleged. (R. 20). Inasmuch as Plaintiff's treating physicians prescribed anti-depressants to treat Plaintiff's depression (R. 345, 348, 350, 352, 354, 442), none of Plaintiff's treating physician's ever recommended psychiatric treatment for Plaintiff, and Plaintiff did not consistently complain of depressive symptoms. The ALJ's determination that Plaintiff's depression was nonsevere is thus adequately supported by the record.

## § 9.08 Diabetes Mellitus

Disability under 20 C.F.R. Pt. 404, Subpt. P, App. A § 9.08 ("§ 9.08") requires

A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or

B. Acidosis occurring at least on the average of once every two months documented by appropriate blood chemical tests (pH or $PCO_2$ or bicarbonate levels); or
C. Retinitis proliferans.

In the instant case, the ALJ determined Plaintiff's diabetes mellitus did not meet the criteria under § 9.08 (R. 21). Inasmuch as the record establishes Plaintiff was diagnosed and treated for diabetes by Plaintiff's treating physician Dr. Dheenadayalu (R. 346, 353, 355, 357, 485), a nerve conduction study on October 28, 2004 by Dr. Yurcheshen opined showed Plaintiff with "mild carpal tunnel syndrome . . . [and a] nearly normal neurologic examination" (R. 262), thus supporting Plaintiff's diabetes mellitus did not result in "[n]europathy demonstrated by significant disorganization of function in two extremities resulting in substantial disturbance of gross or dexterous movements" as required under § 9.08A. Plaintiff's diabetes mellitus also did not result in "[a]cidosis occurring at least on the average of once every two months" as required under § 9.08B, as Plaintiff's urinalysis tests showed normal pH levels[21] on May 25, 2006 (pH of 8.0 (R. 389)), on July 12, 2006 (pH of 8.0 (R. 378)), on May 21, 2007 (pH of 6.0 (R. 370)), and on April 8, 2008 (pH of 6.6 (R. 473)), and Plaintiff's blood tests showed some normal,[22] and some below normal bicarbonate levels on May 26, 2006 (21 mmol/L (R. 386)), on July 12, 2006 (27 mEq/L (R. 381)), March 2, 2007 (26 mmol/L (R. 413)), May 21, 2007 (21 mmol/L (R. 369)), July 27, 2007 (22 mmol/L (R. 367)), September 18 (23 mEq/L (R. 365)), and September 21, 2007 ( 24 mEq/L (R. 362)). The ALJ, however, did not

_____

[21] An individual's pH is considered normal when measured between 5.0 - 8.0. on urinalysis.

[22] An individual's bicarbonate level is considered normal when blood CO2 measures between 22-30 mmol/L (millimoles per liter) or 20-29 mEq/L (milliequivalent per liter).

comment on whether Plaintiff's below normal bicarbonate levels rendered Plaintiff disabled by diabetes mellitus under § 9.08B. The record is also devoid of any evidence Plaintiff suffered "retinitis proliferans" as required under § 9.08C, further establishing Plaintiff is not disabled under § 9.08.

Notably, the ALJ based his determination Plaintiff's diabetes mellitus was "not as severe as alleged" on Plaintiff's noncompliance with Dr. Storch's prescribed treatment (R. 20), and this determination, although harmless to the ALJ's determination that Plaintiff fails to meet the criteria under § 9.08, is contrary to substantial evidence, and constitutes error. Inasmuch as the Act affords ALJ's the ability to determine if the level or frequency of a claimant's treatment is inconsistent with the level of the claimant's subjective complaints, SSR 96-97p, the ALJ may not otherwise draw any adverse inference about the claimant's credibility "without first considering any explanations that the [claimant] may provide, or other information on the case record." *Id*. In the instant case, substantial evidence establishes Plaintiff's financial constraints made it difficult for Plaintiff to pay for her prescribed diabetes treatment (R. 269, 274, 341), and the ALJ's failure to question the Plaintiff regarding her reasons for non-compliance with her treating physician's prescribed diabetes treatment leaves the record materially underdeveloped, and requires remand. Upon remand, the ALJ's determination whether Plaintiff is disabled under § 9.08 should include consideration of all of the evidence in the record, including Plaintiff's below normal bicarbonate levels and Plaintiff's reasons for her non-compliance with Dr. Storch's prescribed diabetes treatment.

As noted, Discussion*, supra,* at 27-28, the record does not contain evidence of any limiting effects related to Plaintiff's obesity, and thus, the ALJ is not required to

consider the additional and cumulative effects of Plaintiff's obesity when evaluating

Plaintiff's diabetes mellitus. However, because the decision is before this court for a

Report and Recommendation, the court proceeds to the next step of the inquiry.

**E.** **"Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in the five-step analysis is whether the applicant has the

"residual functional capacity" to perform past relevant work. "Residual functional

capacity" is defined as the most work a claimant can still do despite limitations from an

impairment and/or its related symptoms. 20 C.F.R. § 416.945(a). If a claimant's residual

functional capacity is insufficient to allow the performance of past relevant work, the ALJ

must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.960(c).

In the instant case, the ALJ determined Plaintiff was not able to perform any past

relevant work (R. 23), and Plaintiff does not dispute this matter.

**F. Suitable Alternative Employment in the National Economy**

Here, the ALJ found Plaintiff was not able to perform her past relevant work as a

machine operator (light, medium), has no transferable job skills, and retained the ability

to make vocational adjustment to other jobs that exist in the national economy. (R. 23).

The ALJ further determined Plaintiff has the residual functional capacity to lift/carry 20

pounds occasionally and 10 pounds frequently, sit 2 hours in an 8-hour workday,

stand/walk 6 hours in an 8-hour workday, should not work in unprotected heights,

around heavy, moving, or dangerous machinery, climb ropes, ladders or scaffolds, and

occasional limitation in pushing/pulling with her upper extremities. (R. 21). Plaintiff

disputes this finding.

The Second Circuit requires that "all complaints . . . must be considered together

32

in determining . . . work capacity." *DeLeon v. Secretary of Health and Human Services,*
734 F.2d 930, 937 (2d Cir. 1984). It is improper to determine a claimant's residual work
capacity based solely upon an evaluation of the severity of the claimant's individual
complaints. *DeLeon*, 734 F.2d at 937. To make such a determination, the Commissioner
must first show that the applicant's impairment or impairments are such that they
nevertheless permit certain basic work activities essential for other employment
opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the
Commissioner must demonstrate by substantial evidence the applicant's "residual
functional capacity" with regard to the applicant's strength and "exertional capabilities."
*Id*. at 294.

An individual's exertional capability refers to the performance of "sedentary,"
"light,"[23] "medium," "heavy," and "very heavy" work. *Decker*, 647 F.2d at 294. In addition,
the Commissioner must establish that the claimant's skills are transferrable to the new
employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[24] *Id*. at 294.

---

[23] "Light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

[24] The regulations define three categories of work experience: "unskilled", "semi-skilled", and
"skilled". *Decker, supra*, at 295.
    "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be
learned on the job in a short period of time.  The job may or may not require considerable
strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials
from machines which are automatic or operated by others), or machine tending, and a person can usually
learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A
person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).
    "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the
more complex work duties. Semi-skilled jobs may require alertness and close attention to watching
machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding
equipment, property, materials, or persons against loss, damage or injury; or other types of activities
which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be
classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be
moved quickly to do repetitive tasks."

This element is particularly important in determining the second prong of the test, whether suitable employment exists in the national economy. *Id.* at 296. Where applicable, the Act's Medical-Vocational guidelines may be used to meet the Secretary's burden of proof concerning the availability of alternative employment and supersede the requirement of vocational expert testimony regarding specific jobs a claimant may be able to perform in the regional or national economy. *Heckler v. Campbell*, 461 U.S. 458, 462 (1983).

A person capable of performing "light" work must be able to do substantially all of these activities. *Id.* The Act requires the ALJ use the same residual functional capacity assessment used to determine if a claimant can perform past relevant work when assessing a claimant's ability to perform other work. 20 C.F.R. § 404.1550(c)(2). Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *Id.* In instances where nonexertional limitations diminish a claimant's ability to perform the full range of "light" work, the ALJ should require the Secretary to solicit testimony from a vocational expert regarding the availability of jobs in the national and regional economies suitable for employment of an individual with exertional and nonexertional  limitations similar in nature to the claimant's. *Bapp,* 802 F.2d at 606. Following a vocational expert's testimony, a plaintiff must be afforded an opportunity to

---

20 C.F.R. §404.1568(b).

rebut the expert's evidence. *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

ALJ's are required to provide, at a minimum, the reasons for their decisions, *Connor*, 900 F. Supp. 994, 1003 (N.D.Ill. 1995) (citing *Diaz v. Chater*, 55 F. 3d 300, 307 (7th Cir. 1995)), and remand is proper for consideration of additional evidence not previously addressed. 42 U.S.C. § 405(g), *Connor*, 900 F. 2d at 1004 (remand where ALJ failed to consider entirety of VE's testimony). In the instant case, the ALJ determined that Plaintiff was not disabled under 20 C.F.R. Pt. 404, Subpt. P. App. 2 Table No. 2, Rule 202.21 ("Rule 202.21") (R. 23), based on the opinions of Dr. Findlay and Dr. Toor, who saw the Plaintiff on only two occasions, Discussion, *supra*, at 34, and a flawed credibility determination, Discussion, *supra*, at 33.

Contrary to substantial evidence, the ALJ's residual functional capacity determination (R. 22), is based solely on the normal results of Plaintiff's May 20, 2003 nerve conduction study. (R. 495). The ALJ assigned "little weight" to Dr. Steven's September 4, 2003 opinion that Plaintiff has polymyalgia rheumatica (R. 23), and failed to consider Plaintiff's updated nerve conduction test results on January 28, 2004 (R. 262), that Dr. Yurcheshen opined "confirmed [Plaintiff's] carpal tunnel syndrome bilaterally . . . [and] could explain some of [Plaintiff's] upper extremity symptoms." (R. 262). The ALJ's residual functional capacity assessment of Plaintiff, without consideration of Dr. Yurcheshen's diagnosis (that Plaintiff had carpal tunnel syndrome), therefore requires remand for further development of the record. *Carbone v. Astrue*, 2010 WL 3398960, at *11 (Aug. 26, 2010 E.D.N.Y.) citing *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 290 (E.D.N.Y. 2004) (ALJ's failure to mention parts of the record that contradict his conclusion constitutes error).

With regard to the ALJ's determination that Plaintiff's subjective complaints were not credible, the Second Circuit has held that a claimant's subjective complaints "are an essential diagnostic tool," *Williamson*, at *5 citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)). In the instant case, the ALJ's categorical rejection of Plaintiff's complaints of pain related to Plaintiff's ischemic heart disease (R. 22), constitutes error. The Act requires the ALJ, in evaluating pain, to consider all of a claimant's symptoms, "including pain, and the extent to which the symptoms *can reasonably be accepted as consistent with the objective medical evidence, and other evidence."* 20 C.F.R. § 416.929(a) (italics added). A claimant's credibility determination must include the entire case record, objective medical evidence, the individual's own statements about symptoms, statements provided by treating or examining physicians or psychologists, and other persons about the symptoms and how they affect the claimant, and any other relevant evidence in the case record. *See* Social Security Ruling ("SSR")  96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996)(assessing credibility of a claimant's statements); *Aragon-Lemus v. Barnhart*, 280 F. Supp. 2d 62, 70 (W.D.N.Y. 2003)(credibility assessment must be supported by substantial evidence). Relevant evidence includes, but is not limited to, an evaluation of medical signs and laboratory findings, diagnosis, prognosis and other medical findings by treating or examining physicians and other medical sources, treatment and response, prior work record and efforts to work, daily activities, and other information about the individual's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p at *1.

Here, the ALJ's credibility assessment does not include consideration of the

factors under SSR 96-7p, including consideration of Plaintiff's July 18, 2006 angiography

that revealed "lengthy" narrowing in the vertical segment of Plaintiff's LCA (R. 488),

Plaintiff's November 28 2005 cardiac catheterization that showed a 90% lesion of

Plaintiff's LCX (R. 277), Plaintiff's treating physician opinions regarding Plaintiff's pain,

and Plaintiff's prior work record. (R. 50-53). Significantly, none of Plaintiff's treating

physicians ever questioned Plaintiff's symptoms of chest pain, or Plaintiff's inability to

conduct activities of daily living, but, to the contrary, when presented with Plaintiff's

complaints of chest pain, admitted Plaintiff to the hospital, conducted tests that showed

Plaintiff's ischemic heart disease required immediate care, and performed necessary

surgical intervention. (R. 445, 487). Nor did Plaintiff's treating physicians ever question

the presence of Plaintiff's pain, reduced, or stopped prescribing medication to alleviate

pain related to Plaintiff's ischemic heart disease.

That the ALJ failed to consider the entire record is evident by the ALJ's summary

rejection of Plaintiff's treating physician opinions regarding the severity of Plaintiff's pain,

and failure to consider Plaintiff's medication history within Plaintiff's credibility

assessment raises doubt as to whether the entire record was considered. *Carlisle v.

Barnhart*, 392 F.Supp. 2d 1287, 1294 (N.D. Ala. 2003)(ALJ's rejection of Plaintiff's

treating physician opinions improper where record supports treating physicians never

questioned the presence of Plaintiff's pain). *Hall v. Astrue*, 677 F.Supp.2d 617, 632

(W.D.N.Y. 2009)(ALJ's omission of claimant's medication history and several medical

conclusions that supported Plaintiff's credibility raised doubt whether entire record was

considered). As discussed, Discussion, *supra*, at 26, the ALJ's exclusive reliance on the

opinions of Drs. Findlay and Toor in determining Plaintiff's residual functional capacity

was also erroneous in light of the timely medical evidence from Plaintiff's treating

physicians and requires remand for further development of the record in accordance

with the treating physician's rule.

The Act also requires ALJ's to consider any additional and cumulative effects of

obesity when assessing a claimant's residual functional capacity. 20 C.F.R. Pt. 404,

Subpt. P, App. 1 § 4.00I1 ("§ 4.00I1"). District Courts, however, vary in their

interpretation of the extent and explicitness of the ALJ's explanation of the additional

and cumulative effects of a claimant's obesity as it relates to the claimant's residual

functional capacity. *Rockwood*, 614 F. Supp.2d 252, 277. An ALJ implicitly considers a

claimant's obesity when the ALJ adopts the examining physician's assessment of the

claimant's physical limitations. (*Id*. at 278 (citing *Cruz v. Barnhart*, 2006 WL 1228581, at

*9 (S.D.N.Y. May 8, 2006)). In the instant case, Dr. Storch does not consider Plaintiff's

obesity a limiting factor related to Plaintiff's residual functional capacity, and the ALJ's

adoption of Dr. Storch's assessment of Plaintiff's physical limitations (R. 20), thereby

meets the standard established by *Cruz*.

Upon remand, the ALJ's residual functional capacity assessment of Plaintiff

should include consideration of Plaintiff's ability to use her upper extremities for pushing

and pulling with Plaintiff's January 28, 2004 nerve conduction study test results (R. 262),

consideration of Plaintiff's ability to walk long distances, or stand for long periods of time,

with Plaintiff's May 2, 2006 ETT test results (R. 428), and consideration of Plaintiff's

January 28, 2004 nerve conduction test results. *Williamson v. Commissioner of Social*

*Security*, 2011 WL 1303283, at *5 (N.D.N.Y. March 31, 2011)(remand proper to afford

ALJ opportunity  to reconcile RFC assessment with record evidence). Remand also

should include consideration of all of the record evidence, including Plaintiff's treating

physician's opinions regarding Plaintiff's activities of daily living, the factors required

under SSR 96-7P, the weight granted to the opinions of Dr. Findlay and Dr. Toor, and

Plaintiff's treating physician opinions about Plaintiff's ability to work. Finally, in the

interest of completeness, should the District Judge disagree that Plaintiff's ischemic

heart disease meets the criteria of either § 4.04C1a or b, then the ALJ should be

required to contact Dr. Kang and Dr. Conley in order to establish whether Plaintiff's

narrowed arterial segments were greater than 1 cm in length and whether Plaintiff meets

the criteria under § 4.04C1c. *Rivera v. Commissioner of Social Sec.*, 728 F. Supp. 2d

297, 329 (S.D.N.Y. 2010)(ALJ required to contact physician to obtain quantitative test

results that may establish Plaintiff met listing for pulmonary disease).

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion (Doc. No. 10) should be DENIED;

Plaintiff's motion (Doc. No. 13) should be DENIED; the matter should be REMANDED

for further development of the record in accordance with this REPORT and

RECOMMENDATION.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       October 20, 2011
             Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 20, 2011
                 Buffalo, New York